# EXHIBIT T

THIRD RECORDING (234) HIND OMAR & CHERISE FROST
TRANSCRIBED BY:  CAROLYN GRITTINI, CSR-3381

MS. OMAR:  How are you?
MS. FROST:  I'm okay.  Just putting it out there now, please forgive my low energy, I'm a little under the weather.
MS. OMAR:  I completely understand.  My toddler did the same thing to me.  So I totally get it.
MS. FROST:  Gotta love it, right?
MS. OMAR:  Yeah, it's the price of doing business.
MS. FROST:  Yep, that's right.  So I just wanted to touch bases with you because I've been doing a whole lot of back and forth communication between the law school and our legal counsel and ABA and I'm just trying to make sure I understand everything and what we're able to offer.  And I know your deadline was coming, so I apologize for taking so long.
MS. OMAR:  I appreciate your due diligence.
MS. FROST:  It's okay.  I just needed to make sure that I was understanding fully what our options are and everything.
so basically, the law school is going to stick with the position that to have a fully remote program fundamentally alters the course of study as their

Fortz Legal Support

www.FortzLegal.com

844.730.4066



1  THIRD RECORDING (234) HIND OMAR & CHERISE FROST
2  TRANSCRIBED BY:  CAROLYN GRITTINI, CSR-3381
3
4  MS. OMAR:  How are you?
5  MS. FROST:  I'm okay.  Just putting it out there now,
6  please forgive my low energy, I'm a little under the
7  weather.
8  MS. OMAR:  I completely understand.  My toddler did
9  the same thing to me.  So I totally get it.
10  MS. FROST:  Gotta love it, right?
11  MS. OMAR:  Yeah, it's the price of doing business.
12  MS. FROST:  Yep, that's right.  So I just wanted to
13  touch bases with you because I've been doing a whole
14  lot of back and forth communication between the law
15  school and our legal counsel and ABA and I'm just
16  trying to make sure I understand everything and what
17  we're able to offer.  And I know your deadline was
18  coming, so I apologize for taking so long.
19  MS. OMAR:  I appreciate your due diligence.
20  MS. FROST:  It's okay.  I just needed to make sure
21  that I was understanding fully what our options are
22  and everything.
23  So basically, the law school is going to stick with
24  the position that to have a fully remote program
25  fundamentally alters the course of study as their

Page 2

1  program is designed, so we're not able to offer a
2  fully remote option for you.
3  MS. OMAR:  Okay.
4  MS. FROST:  And so what I would like to do, and I know
5  you're in decision mode, so if you should decide that
6  you still want to attend Wayne State with that in
7  mind, I want to figure out alternate ways to offer
8  accommodations to make sure that your experience is
9  one that works with your needs.
10 MS. OMAR:  What did the ABA say?
11 MS. FROST:  So they said they cannot give direct
12 advice about specific situations, but that they
13 would -- here, let me go back and reference it,
14 because they, actually I guess as a layperson, weren't
15 really interested in talking directly to me.
16 MS. OMAR:  I'm also recording this, by the way, just
17 for my records, is that okay?
18 MS. FROST:  Yeah, yeah.  You have permission.  Thanks
19 for letting me know.
20 MS. OMAR:  I appreciate that.
21 MS. FROST:  Where are we at?  Oh, so actually -- well,
22 let me look back at that.  His response was a little
23 generic.  Because they wouldn't give me more
24 information, I referred them to talk to our law school
25 deans and such and our legal counsel and things were

Page 3

1  involved as well in that discussion, so the response
2  to me was not very detailed.  I don't have their
3  direct responses.  They spoke with -- our law
4  School folks consulted with various peers around the
5  nation as well as like with the laws that dealt with
6  ABA and such, so I don't have direct response, I'm
7  sorry, that wasn't given to me.  I had to refer them
8  to the law school deans.
9  MS. OMAR:  So am I able to -- just in the policy it
10 says that if they were to deny me accommodations, that
11 they would formally have to write that they denied me
12 and why.  Is that something I can request?
13 MS. FROST:  Yeah, I can for -- you mean from the law
14 school?
15 MS. OMAR:  Yes.
16 MS. FROST:  Okay.  Yeah, I mean, I can ask and I
17 suppose you could also ask for a more detailed
18 response in writing.  So that's something I will talk
19 with Dean Welch about it.  And I can ask that through
20 her.
21 MS. OMAR:  So was it -- so for me, it seems like it's
22 in plain English, right?  Like it's in the policy.
23 And so for them, did they just interpret it
24 differently?  Did they use like academic freedom?
25 Like what was the pushback -- I don't want to pry into

Page 4

1  your conversations, but just --
2  MS. FROST:  No, it's okay.  It's okay.  So they're
3  saying it fundamentally alters the course of study.
4  So the course -- their classes and program is not
5  designed to be online.  They use the Socratic method,
6  they have this in-person, interactive style of
7  delivery in terms of like the teaching style.  And so
8  it fundamentally alters it to have remote students, or
9  a student participate remotely I should say.
10 MS. OMAR:  Alters it for who, though?
11 MS. FROST:  I think the learning outcomes and
12 experience that they want students to have would be
13 altered if that student is not participating in
14 person.
15 MS. OMAR:  By who, though?  I feel like the
16 conversation is like -- we're having two different
17 conversations.  Like, they're having a conversation
18 that's for like -- I'm not even -- I'm not arguing
19 with you.  I know that you are just relaying
20 information.  I swear, I'm not trying to be
21 argumentative.  But from my perspective, it feels like
22 we're having two separate conversations.  Where like
23 one is them trying to kind of keep up a status quo or
24 like keep a generic, like generalized student, and
25 that's not the conversation that I'm having.  Like I'm

Page 5

1  having the conversation of like what works for me.
2  Like what works better for me to be able to relay --
3  like to relay the information.  What works better for
4  me to learn -- like I'm having an individualized
5  conversation and they're having a generalized
6  conversation.  I feel like we're having two different
7  conversations.  Does that make sense?
8  MS. FROST:  Yeah, I get what you mean by that.  I
9  mean, like, their style of delivering the information
10 in the classes, their teaching methodology that they
11 as an entire entity follow just doesn't fit the mode
12 of remote study.  And so we want to look at other
13 ways.  I think you mentioned your assistive
14 technology, for example --
15 MS. OMAR:  Except for --
16 MS. FROST:  Is that something we can get for you here?
17 MS. OMAR:  Except for when they take snow days, and
18 when they do --
19 MS. FROST:  I'm sorry can you repeat that one more
20 time?
21 MS. OMAR:  Except for when they do take snow days and
22 when they do go remote?
23 MS. FROST:  I don't know why -- it might be my ears,
24 but can you say that one more time?
25 MS. OMAR:  I'm saying it doesn't fit the mold for

Page 6
1  remote learning except for when they choose to go
2  remote?
3  MS. FROST: Oh, well, that was because of the
4  pandemic, as we know, and that was -- is that what
5  you're referring to?
6  MS. OMAR: No, not even. Exigent circumstances, so
7  like weather. They took a snow day like two weeks
8  ago.
9  MS. FROST: Oh. Yeah, I guess I don't know how they
10 did that. Like I know that the university has decided
11 that for snow days, there will be remote study. I
12 don't know if professors have the discretion to like
13 hold class remotely or not. I don't know if they did,
14 you know, if they chose to say okay, this will be a
15 class day or if they did find ways to do remote
16 instruction. I'm not really certain. Do you know
17 what I mean? Like I'm not sure how faculty are
18 handling those switch to remote days.
19 MS. OMAR: Okay.
20 MS. FROST: But yeah, you're right, the university did
21 pivot to remote because of the weather a couple weeks
22 back.
23 MS. OMAR: And then, who exactly was the one saying --
24 it was it just Dean Welch or were there others?
25 MS. FROST: Yeah, Dean Welch has -- she consulted with

Page 7
1  the associate Dean. So the deans, basically, the
2  deans of the law school
3  MS. OMAR: Okay. And did they offer any alternative
4  to the request, or was it just a flat out like no?
5  MS. FROST: No, that's not -- it's not a flat out no.
6  That's kind of what I was hoping to get to, like what
7  other ways we can accommodate you. We don't want to
8  be in the business of saying flat out nos. We want to
9  find out alternate ways to support. I know you've
10 given us the -- I'm pulling your document back up
11 where you explained your needs.
12 So it's definitely not a flat out no. It's more like
13 that specific mode of instruction alters the
14 fundamental course of study, so we want to look at
15 what other ways can we support. Like I know there's a
16 bunch of other accommodations on there that were to me
17 easier to figure out how to do. We can figure out a
18 plan for cold calling. We can figure out a plan for
19 recording your lectures and so forth and so on. The
20 distance education one was I think the stickiest one,
21 and I want us to go through like what ways we can
22 offer support for the specific things you noted. So
23 like, when I look at the information provided, like if
24 I had to identify the specific areas, like you had
25 mentioned that it takes you longer to study and

Page 8
1  highlight, work through your information, your reading
2  material and that sort of thing. You had mentioned
3  assistive technology, which again is what I'm saying,
4  is there a way we can find out what assistive
5  technology you use, so maybe that's something we can
6  get here at the law school so that you wouldn't have
7  to transport it. You had mentioned having to
8  transport being a challenge, so that's one way we can
9  get around that and offer that technology for you here
10 at Wayne.
11 And then, I'm sorry, I'm trying to skim through --
12 MS. OMAR: No, it's okay, take your time.
13 MS. FROST: Thank you. And then you had mentioned
14 wanting control over your work space to mitigate
15 anxiety. And so I was going to ask a bit more about
16 that. Like how have you managed that in the past with
17 some of your in-person studies, so that I can get
18 thoughts on how we could support that?
19 MS. OMAR: I didn't have these diagnoses during my
20 undergrad.
21 MS. FROST: Oh, I see. Okay.
22 MS. OMAR: Yeah.
23 MS. FROST: Okay. So you did not have to find --
24 MS. OMAR: Accommodate them, no
25 MS. FROST: Okay, I gotcha. Okay. And then I

Page 9
1  remember you telling me that you were connected
2  already with BSBP, the Bureau of Services For Blind
3  Persons.
4  MS. OMAR: Uh-hum.
5  MS. FROST: Have you had them ever engage with you in
6  orienting you to spaces and things like that to make
7  it more comfortable for you?
8  MS. OMAR: Not so much, no, not so much.
9  MS. FROST: Okay. I know that is something that they
10 offer, so that was a thought for how to help with
11 getting comfortable navigating spaces, classrooms,
12 bathrooms and things that you had mentioned in your
13 document to help support getting comfortable here on
14 campus. And then, again, if we didn't have the
15 assistive technology that could support your needs, we
16 were hoping that would be --
17 MS. OMAR: Did they see any other issue with any of my
18 other accommodations?
19 MS. FROST: The only other accommodation, which I
20 believe had already spoken with Sadfah about, the
21 research assistant, you know, we don't typically do
22 the higher of them, you know, assistants for people.
23 That's like, so when a student needs, for example, a
24 personal care attendant, that's the student's
25 responsibility to hire and bring someone on. And I

Page 10

1  think when you and I spoke last, we talked about the
2  fact that BSBP actually has in the past paid for a
3  tutor for a student who was going to Wayne State.  And
4  that I could see operating in a similar capacity as
5  what you had written there.  But other than --
6  MS. OMAR:  But what I'm asking for is academic.
7  MS. FROST:  Say it one more time.
8  MS. OMAR:  Like the service that I'm asking for is an
9  academic service.  So like a research assistant from a
10 law school or the law school that's really specific to
11 like exactly what I'm learning.  So it's not just like
12 tutoring in algebra, like it's more so like, help me
13 with the citations in a law school program.  Like help
14 me with the extractions of text from specific cases to
15 put into my publications.  So that's more so what I
16 was looking for, not so much like a personal helper or
17 a tutor.  It was more so like research based more than
18 it was personal.
19 MS. FROST:  Okay.  So I think -- even though I know
20 I've called them a tutor, I was thinking that whatever
21 qualifications they have, it would be something we
22 assess through, sort of, say, interviewing or talking
23 with people.  I don't know if the law school has TA's,
24 for example.  I know other graduate programs might
25 have a graduate teaching assistant.  So, for example,

Page 11

1  if they have someone who kind of fits that category,
2  having them would -- if they have the time, I suppose,
3  and the capacity, to act as a person in that capacity,
4  they would know law --
5  MS. OMAR:  Exactly.
6  MS. FROST:  -- citations.
7  MS. OMAR:  Yeah.
8  MS. FROST:  You know --
9  MS. OMAR:  Yeah.
10 Ms. Frost:  So I guess I'm using the words tutor, the
11 word tutor, but I mean more like a person specific to
12 law -- familiar with law is what I mean.  But then
13 paid through BSBP so --
14 MS. OMAR:  Got it
15 MS. FROST:  So similar to how we hired that tutor for
16 the student, but of course, on the level of --
17 MS. OMAR:  It's so strange.  Michigan hired one for me
18 from their department.  Like it wasn't even like a --
19 I get it, I understand.  And BSBP I'm sure will be
20 more than happy to do it.  But it's just strange that
21 they're pushing back on that because Michigan was so
22 willing to do it.
23 MS. FROST:  Yeah, I don't think that they -- well, I
24 can speak for our department in terms of resources.
25 That's why we have to go outside to see if BSBP has

Page 12

1  the resources.  We don't particularly have a state
2  fund that we can dip into to pay a tutor.
3  MS. OMAR:  Yeah
4  MS. FROST:  So we don't have paid note takers or
5  anything like that here through our office, because we
6  just don't have the funds for that sort of thing.  So
7  I don't know that I would say the law school is
8  pushing back on that.  That's the only thing we
9  actually talked about in such depth was mostly the
10 distant education piece, and then, because that's the
11 only one that they said was a fundamental alteration.
12 The rest of it is just to me about you and SDS kind
13 of, let's navigate how we bring this to fruition --
14 MS. OMAR:  Okay.
15 MS. FROST:  --in a most reasonable way.  So I don't
16 think they're pushing back on anything else, it's just
17 we have to talk about the fundamental alteration of
18 the distance education and find a sort of a work-
19 around for that.
20 MS. OMAR:  Okay.  And did they give you any more
21 expanding upon that of like how it alters or I can't
22 it alters or anything at all?  Or was it just a
23 generalized, like, it just alters?
24 MS. FROST:  Yeah.  It's more like it just alters the
25 course of study.  And what I know of it, I mean, from

Page 13

1  the conversations I had, what I deduced is that the
2  courses are not designed that way.  So they don't have
3  any hybrid courses, for example.  They don't have
4  anything that fits the mold of -- like I suppose, and
5  I've only taught classes that are very low level, sort
6  of Wayne experience, this is how you do college sort
7  of courses, so I don't have enough teaching experience
8  to say, but I'm making an assumption that teaching a
9  course online and the things that you assess, the ways
10 that you include interaction and that's a little
11 different than when you teach in person and really
12 engaging with students.  I'm assuming because those
13 are such different teaching modalities, that's why
14 it's like, if they modify that, it alters what they're
15 teaching, like learning outcomes and some of their
16 lesson plans potentially.  I know I'm (unintelligible)
17 when I say lesson plans, but the structure of the way
18 that they've designed their courses, doing the remote
19 course alters that.  And so they're committed to a
20 specific teaching modality that they have found to
21 meet learning objectives that are necessary for, you
22 know, accreditation and such.  And then eventually
23 being licensed.  Right.  They have it designed a
24 certain way.  Going to the alternate version of that,
25 like a remote version of that, they feel alters too

Page 14

1  significantly their course design.  So like that's
2  my explanation of it based on what I understand.
3  MS. OMAR:  Okay.  And getting that write-up from them
4  with the denial, is that something that I should
5  e-mail Dean Welch about or maybe cc you?  Is that
6  something that you want to reach out to her for?
7  MS. FROST:  Either way is fine to me.  Obviously, I
8  always encourage students to advocate for whatever
9  they want to themselves.  You know, you're welcome to
10 speak on your behalf and I can also ask them.  Because
11 again, like I say, it's not a denial of complete
12 accommodations.  What we want to do is look at a
13 different way to accommodate that specific request
14 they feel alters the fundamental -- fundamentally
15 alters, excuse me, their course of study.
16 MS. OMAR:  Okay.
17 MS. FROST:  What do you feel most comfortable with in
18 terms of requesting a written statement?
19 MS. OMAR:  I can e-mail them for that, but I'll cc you
20 on it.
21 MS. FROST:  Yeah.
22 MS. OMAR:  Can I set up another appointment with you
23 maybe next week when you're back in the office?  It's
24 just a lot for me to take in, I just want to think on
25 it a little bit.

Page 15

1  MS. FROST:  That's perfectly fine.  Let me look at my
2  calendar.
3  MS. OMAR:  Okay, perfect.  I'm sorry, it's just a lot
4  for me to process and not the outcome that I was
5  anticipating, so I just want to take a little time to
6  think.
7  MS. FROST:  And that's okay, I understand.
8  MS. OMAR:  Thank you.
9  MS. FROST:  So what days work best for you?  I have a
10 lot of availability on the 3rd and the 6th most
11 availability, but I do different slots throughout the
12 rest of the week two.  So I can be -- I can look at
13 other dates as well
14 MS. OMAR:  I can do the 3rd in the morning.
15 MS. FROST:  Okay.
16 MS. OMAR:  Or --
17 MS. FROST:  So I have either around the same time like
18 around 9:30, ten.  My morning is kind of clear, so
19 eleven even.
20 MS. OMAR:  Yeah, let's do -- 9:30 works.
21 MS. FROST:  Okay.
22 MS. OMAR:  9:30?
23 MS. FROST:  Not a problem
24 MS. OMAR:  Yeah, that works
25 MS. FROST:  So I'll send you another Zoom link.

Page 16

1  MS. OMAR:  Perfect.
2  MS. FROST:  Okay.
3  MS. OMAR:  Thank you.
4  MS. FROST:  You're welcome, Hind.  And I'll talk with
5  you on Monday.
6  MS. OMAR:  All right, sounds good, Dean -- Director.
7  Thank you you're the best.
8  MS. FROST:  I hope you feel better too.
9  MS. OMAR:  Thank you so much.  You as well.
10 (Zoom disconnects).
11 MALE VOICE:  I'm not surprised.

Page 17

```
            CERTIFICATE OF NOTARY
STATE OF MICHIGAN )
                  ) SS
COUNTY OF MACOMB  )


        I, CAROLYN GRITTINI, certify that this
recording was transcribed by me on the date
hereinbefore set forth; that the foregoing recording
was recorded by me stenographically and reduced to
computer transcription; that this is a true, full and
correct transcript of my stenographic notes so taken;
and that I am not related to, nor of counsel to,
either party nor interested in the event of this
cause.




                        Carolyn Grittini
                        _____
                        CAROLYN GRITTINI, CSR-3381
                        Notary Public,
                        Macomb County, Michigan.
My Commission expires: July 15, 2024
```