Robert D. Dinerstein

Professor of Law Emeritus

American University Washington College of Law

June 19, 2024

I am submitting this expert report in connection with the case of *Hind Omar v. Board of Governors of Wayne State University,* Case No. 2:23-cv-11689-GCS-APP (ED Mich). I have been asked to give an opinion regarding the adequacy of the process of assessing the reasonable modifications plaintiff Omar sought to permit her to matriculate at Wayne State University Law School {"the law school") for AY 2023-24 and beyond.

By way of background (my full CV has been submitted under separate cover), I am an emeritus law professor at American University Washington College of Law (WCL), where I taught full-time from 1983 through 2023. My areas of specialization include clinical legal education and disability rights/law, among other areas. In the latter area, I taught a disability law-related seminar from 1985-2023 (with exceptions for when I was on sabbatical leave or serving in other administrative positions) and founded and directed the law school's Disability Rights Law Clinic from 2005-2023 (except for 2020-21, when I served as acting dean of WCL). I have written and presented extensively on a variety of disability rights topics, including those related to reasonable accommodations for law students and lawyers with disabilities. Over the years, I have taught and interacted with many law students with disabilities and discussed with them their reasonable accommodations (both sought and received), and have consulted with WCL faculty and staff regarding these issues. My administrative positions within WCL included serving as director of the clinical program (1989-1996 and 2008-2018), associate dean for academic affairs (1997-2004), associate dean for experiential education (2012-2018), and, as noted, acting dean of WCL (2020-21), when WCL was fully remote because of the COVID-19 pandemic.

In addition to the above, I served on the ABA Council of the Section of Legal Education and Admissions to the Bar (2006-2011), the entity responsible for promulgating the ABA Standards and Rules of Procedure for Approval of Law Schools ("ABA Standards") and currently serve as chair of the ABA Commission on Disability Rights and co-chair of the disability rights committee of the ABA Section of Civil Rights and Social Justice. Of course, none of my observations in this report is to be attributed to those entities.

As reflected in my CV, both at WCL and in connection with the ABA Commission on Disability Rights, I have spoken on a number of conference panels regarding students with disabilities and the reasonable accommodations process.

I have testified as an expert witness on behalf of the respondent in *Ross v. Hatch,* a Virginia state-court case concerning alternatives to guardianship for a woman with intellectual disability. (The

court credited my testimony on the feasibility of supported decision making as an eventual alternative to guardianship over the respondent.) I also have been retained as an expert witness (on behalf of the defendant institution) in a Pennsylvania state court case (*Lauletta v. Woods*) concerning the ability of people with intellectual disability to consent to sexual interactions. Also, in the mid-1990s, I was appointed as a special hearing officer to preside over a dispute between the US Department of Education and the Virginia Department of Education over the latter's compliance with provisions of the Individuals with Disabilities Education Act (*Virginia Dep't of Education v. Riley*).

My report is based primarily on the above experience; my interview of the plaintiff in this litigation; my review of materials produced to date in discovery by both parties in the litigation; and visits to selected internet sites. I reserve the right to amend my report in light of access to additional discovery as it becomes available.

**Overall Conclusion**

As explained in the body of this report, in my opinion, there were a number of ways in which Wayne State University Law School and University officials failed to give adequate consideration to the reasonable accommodations[1] that plaintiff sought. Plaintiff is a qualified individual with disabilities who is able to meet the essential requirements of the law school program with reasonable accommodations. The University and law school[2] rejected her request for remote attendance for certain classes without engaging in an individualized evaluation of whether such a request was reasonable. The law school's claim that such a request, as well as the request for modified Socratic questioning, would amount to a fundamental alteration of its program or ABA standards is insufficiently developed and non-individualized. The law school's rejection of limited remote learning and modified questioning, as well as some other requested reasonable accommodations, did not take into sufficient account plaintiff's psychological/mental disabilities, disabilities that made problematic some of the accommodations that the law school had provided to previous students who were blind. In this respect, the law school did not address plaintiff's individualized circumstances.

**Methodology and The Reasonable Accommodations Process**

My years of experience and extensive background in law school administration, disability law, and the process of reasonable accommodations for people with disabilities, and the specialized

---

[1] In this report, I will use the terms "reasonable accommodations" and "reasonable modifications" interchangeably.
[2] For ease of reference, I will refer to the law school when discussing the role of Wayne State officials unless the context requires otherwise. There appeared to be considerable back and forth between the Student Disability Services office and law school administration with regard to the accommodations process in this case.

2

knowledge I have developed as a result, permits me to analyze the way in which the process of seeking and obtaining reasonable accommodations should work in the context of law schools.

At the undergraduate level, a qualified student with a disability seeking reasonable accommodations goes to the university student disability services office and meets with a counselor to go over the requested accommodations. The student would provide the counselor with appropriate documentation of the condition(s) for which a reasonable accommodation is needed. The student might propose a specific accommodation, which the university office should attempt to provide, though the office may suggest an alternative if it would adequately meet the student's needs. In addition to dealing with the vagaries of the specific accommodations, the university office would also be aware of any defenses to the request, such as undue financial hardship, fundamental alteration of the academic program, or direct threat, that the university might assert. If the parties come to an agreement (through what is called an "interactive process"), the office would produce an accommodations letter and give it to the student. The student would then be responsible for showing the letter to each of the student's professors to alert them to the reasonable accommodations that had been identified. The faculty member would have no role in overruling the accommodations or otherwise failing to implement them.

The reasonable accommodations process in law schools works slightly differently. The first part of the process is the same as above, but the disability counselor does not give the student an accommodations letter and the student does not present the letter to the student's professors. Because most law schools use blind-grading practices in examination-based classes, it would be inappropriate for the faculty member to know which student is receiving accommodations and what those might be.[3] Rather, the university student disability services office communicates to a law school administrator (often the dean of students or someone in that official's office) the reasonable accommodations to be provided to the student. That administrator would then communicate with the student to indicate what those accommodations would be. Prior to the final communication of reasonable accommodations from the disability services office to the law school administration, the university counselor might be in contact with the law school administrator to determine whether a proposed reasonable accommodation would amount to undue hardship or a fundamental alteration. The student's faculty members would not necessarily know if a student is receiving reasonable accommodations or what those might be.[4] Importantly, as is the case in the undergraduate program, individual faculty members would have

---

[3] Of course, the student could choose to disclose their disability to the professor (as many of my students have, especially in recent years). Also, some accommodations, such as authorization to leave class without notice to deal with gastrointestinal distress, require that the professor be made aware of them to avoid any misunderstanding of the student's action.

[4] Many students have non-obvious or so-called invisible disabilities (e.g., learning disabilities, ADHD, psychological disabilities) such that there would be no way to know if they had a disability unless they disclosed it. Obviously, if a student had a visible disability (e.g., a sensory disability such as blindness or deafness requiring an interpreter, or someone who used a wheelchair), the faculty member would know the student had a disability, but, even then, might not know all of the reasonable accommodations the student was receiving.

3

no role in overruling or failing to implement reasonable accommodations the law school administration had agreed to provide.

**Specific Findings**

Omar Hind ("plaintiff" or "Ms. Omar") is a qualified individual with a disability. Her disabilities—extremely low vision (legal blindness), and chronic mental illnesses (anxiety and depression, and, as reflected in the April 19, 2024 evaluation from Drs. Lewitzke and White, PTSD)—clearly establish that she has one or more physical or mental impairments that substantially limit one or more of her major life activities. As for her qualifications for law school study, the law school not only accepted Ms. Omar's application for admission to the law school for AY 2023-24 (and indeed re-filed her application from the prior year, when she was wait-listed, without her even knowing it) but provided her with a full-tuition scholarship.

**Remote Learning**

Although the plaintiff and law school and university officials had disagreements about various reasonable accommodations that Ms. Omar proposed, the most contentious disagreement was over her request that she be allowed to take certain classes remotely. The law school has argued that remote education would be a fundamental alteration of not only its program but ABA standards. These claims are without merit.

In part as a result of programmatic adaptations made necessary by the COVID-19 pandemic,[5] as well as enhanced developments in remote leaning, the ABA has in recent years liberalized its standards regarding remote learning. Most critical for our purposes are Standard 306 (d), which authorizes a law school to grant up to 50% of its required credit hours through distance education[6], and Standard 306 (c), which states that "Remote participation in a non-Distance Education Course by a student as an accommodation provided under law (such as the Americans with Disabilities Act) or other exceptional circumstances must not cause the course to count towards the distance education credit limits in subsection (d) for that student." The 50% figure is an increase from the prior limit of 33%. Although the Standards do not *require* a law school to offer remote learning opportunities to students, the reference to the ADA in Standard 306 (c) plainly contemplates that remote learning may sometimes be needed as a reasonable modification of the law school's program.

The parties have differed over whether that the law school offered remote learning to all students in the early days of the COVID-19 pandemic is relevant to whether it is able or willing to do so now for the plaintiff. Notwithstanding the differences between emergency-based, institution-wide practice and an individual reasonable accommodation, what the former period

---

[5] *See, e.g.,* James Leipold, "Access to Legal Education Expanded Through Increased Distance Learning," August 17, 2023, available at https://www.lsac.org/blog/access-legal-education-expanded-through-increased-distance-learning  The article appears on the website of the Law School Admission Council (LSAC). The author is a senior advisor to LSAC and before that the long-time director of the National Association for Law Placement.

[6] In this report, I use remote learning and distance education interchangeably.

did demonstrate was that law schools could deliver adequate academic content remotely and do so in a manner that satisfied its own and ABA standards. Law schools, including my own (and, as noted, I served as acting dean during a year of completely remote learning), held out to its students that the substitute academic program met professional standards. Indeed, insofar as they charged students full or only slightly discounted tuition, it would have been unseemly to claim otherwise. Moreover, I am unaware of any negative consequences for these remote learners on the bar examination or upon entering practice.

The law school's primary objection to permitting Ms. Omar to take some classes remotely (other than the "if we do it for you, we'd have to do it for others" rationale, which one administrator communicated to her) is that it would preclude her from taking part in the give-and-take discussions that take place in a law school classroom. Technology seemingly could solve that problem easily and the university touts its HyFlex technology as permitting remote learning. The law school's response was that its classrooms were not currently equipped with HyFlex, but I saw no indication of why one or more classrooms could not be outfitted with this technology. It seems highly unlikely that such installation would constitute an undue financial hardship when taking into account the law school's and university's overall financial resources.

My understanding is that the law school also has used remote learning options for students to deal with weather emergencies (i.e., snow). Again, doing so, even under different circumstances, certainly shows that it can be done.

The law school also seemed to object to providing remote learning for Ms. Omar because it had had experience with accommodating blind students previously and was able to do so without providing for remote learning. Of course, no one should be required to use remote learning (absent an emergency such as COVID-19) but such a response fails to take into account Ms. Omar's individualized circumstances. She is not just a blind student; she is a person with significant mental health conditions that affect her interactions with others in certain heavily populated environments. Notably, Ms. Omar sat in on some classes (a day and an evening class) after her admission to see how sitting in the classroom would work. Whether she sat in the front of the classroom (as she did in the day class) or in the rear (as she did in the evening class), she found the experience highly unsettling. Not only was she distracted but she was concerned that her presence (including her technology) was distracting to other students.

Finally, it is important to note that Ms. Omar was not requesting that her entire law school experience be remote. She has informed the law school that she would be prepared to attend in person guest lectures, seminars that are discussion-based, and, significantly, experiential education courses (clinics, externships, and simulation courses). Had the interactive process between plaintiff and the law school developed further it is possible that the parties would have agreed on even more settings in which in-person attendance would not be problematic for Ms. Omar.

**Modified Professorial Questioning**

Another point of contention between Ms. Omar and the law school/university disability services office was her request that she not be subjected to some forms of Socratic questioning. In particular, she has indicated that questions from professors that would require her to identify portions of cases or other readings in order to respond to the question would be difficult for her because it would take her time to gain access to the reading or her outlines, time that would not only frustrate her (and increase her anxiety) but probably be a burden for classmates (and possibly the professor) who would be required to wait longer than usual for her response. Ms. Omar has indicated that she could respond to broader-based questions that were not dependent on citing the reading. She also has said that she could go to office hours and interact with the professor one-on-one to demonstrate to the professor her knowledge of the material.

The university's Student Disability Services office eventual response[7]—after first just asserting that Socratic questioning was an essential feature of the law school curriculum—was to indicate that "a *possible* modification may be to give you prior notice of a general time frame (i.e., prepare for cold calling for a particular week)" or that "you may be able to 'opt out' of cold calls on given days (although again, this option would not be provided on all days as it would fundamentally alter the nature of the program.)" (emphasis added). Although the university did not commit to this modification, it at least showed some willingness to consider it.

But what I found striking was that there was no assessment of how extensive Socratic questioning in the law school was, nor what variations in "pure" Socratic questioning law school faculty have adopted. The stereotypical view of Kingsfield-inspired Socratic questioning—where the faculty member focuses on only a few students for an entire class, asking them a series of hypothetical questions with slight variations in terminology designed to show the limits of their reasoning—is largely a thing of the past. In my experience, even faculty who would consider themselves practitioners of the Socratic arts have adapted the pure form to allow for such variations as (1) dialogues with multiple students in a class session; (2) opt-outs by students (either at the time of the question—"I pass"—or with prior notification); (3) notice to an entire row of students that they will be "on" for next week's classes; and so on. Some of the suggestions Ms. Foster mentioned above fit into this category, but it may well be that these kinds of adaptations are regularly available and would not require some special reasonable accommodation. It is also possible that Ms. Omar could have been assigned to a first-year section that had professors who do not deploy even the modified version of Socratic teaching described above. And, as officials apparently recognized, even when first-year professors use Socratic dialogues in their teaching, in most law schools professors do not use such techniques in their upper-level classes.

This is all to say that what should have happened here was a deeper dive into just how important Socratic dialogue was to the law school curriculum and in individual first-year classes as opposed to simply asserting that it is an essential element of the law school's program. Although the Student Disability Services office indicated it had consulted with the law school about the issue

---

[7] Email from Cherise Foster to Hind Omar, April 26, 2023.

of modifying Socratic questioning there is no indication that anyone in the law school looked carefully at the above possibilities. Even though it is the university disability office that determines the reasonable accommodations to approve for the student, it is reasonable for that office to rely on what the law school says is essential to its program. But it is critical that those in the law school who are consulted on the matter look critically at the question and not respond reflexively with "Socratic dialogue is an essential characteristic of the program."

**Other Proposed Reasonable Modifications**

In addition to the above reasonable accommodations, Ms. Omar has requested some additional reasonable accommodations that the university and law school have resisted.  For example, she has requested that she be able to take examinations in a private room whereas the law school has responded that she must take the examination in a room with other students who are taking accommodated exams.  Ms. Omar has indicated that such an alternative not only does not work for her (in part because of her anxiety issues) but would be problematic for other test-takers, as her vision disability requires her to read material out loud and sometimes to be able to have a scribe with her. Ms. Omar has noted that when she was an undergraduate at Wayne State she was able to take exams alone in a private room.  It is not at all clear why the law school could not provide a private room for her or, if none was available, use one of the university rooms available for that purpose.

Ms. Omar also expressed concerns about note-taking assistance.  Although it is not clear that the law school would object to this accommodation, Ms. Foster did not explicitly mention it in her April 26, 2023 email.  Ms. Omar is under the impression that she would have to provide her own note-taker. I did not see any information about how the law school provides note-takers but the university website indicates that when someone needs a note-taker, the professor can ask for volunteers from the class or pass around a sign-up sheet. It is not clear what happens if no one comes forward. In my law school, if a current classmate did not volunteer to take notes, the dean of students would recruit (and pay) a student not in the class to perform this task. If note-taking assistance is provided as a reasonable accommodation, it should not be on the student needing the accommodation to arrange for it.

Finally, the Student Disability Services office's listing in the April 26, 2023 email of the ways in which they were prepared to help Ms. Omar with her concerns about in-class anxiety, the need to control her space, knowing where bathrooms and other facilities were, and related matters, while a not unreasonable first offer, fail to take into account her mental health issues that make such seemingly straightforward concerns readily addressable. These proposed interventions might well have worked with other blind students, but they would not necessarily have responded to Ms. Omar's individual circumstances.