UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HIND OMAR,

      Plaintiff,

v.

WAYNE STATE UNIVERSITY
BOARD OF GOVERNORS,

      Defendant.

Case No. 23-11689

Honorable Robert J. White

---

**OPINION AND ORDER DENYING BOTH PARTIES'
MOTIONS FOR SUMMARY JUDGMENT**

---

Plaintiff Hind Omar alleges that Defendant Wayne State University Board of Governors (the Board) violated Title II of the Americans with Disabilities Act (the ADA), 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Michigan's Persons with Disabilities Civil Rights Act (the PWDCRA), MCL 37.1101 *et seq.*, when the University's Office for Student Disability Services (SDS) and law school denied her request for accommodations.[1] (ECF 1, PageID 1-2, 7-13). Both parties now move for summary judgment (ECF Nos. 23, 24). The Parties

---

[1] The Court in this opinion generally refers to conduct by university officials, including individuals at SDS and the law school, as done by "the University" or "Wayne State." Only where particularly relevant does the Court specify university officials' conduct by individual name and/or department.

fully briefed the motions and the Court held oral argument. For the following reasons, the Court denies both motions. Because of sovereign immunity, the Court also (1) dismisses Omar's state law PWDCRA claim and (2) concludes that Omar is not entitled to monetary damages or retrospective relief for her remaining claims.

## I.    Background

Omar is legally blind and diagnosed with a degenerative eye disease; she has been visually impaired since birth. (ECF No. 23-2,[2] PageID.136; ECF No.23-7, PageID.200). In 2021, Omar was also diagnosed with postpartum anxiety and depression. (ECF No. 23-2, PageID.136, 140; ECF No.23-7, PageID.201).

Omar graduated high school in 2012, and she began undergraduate studies at Wayne State University that same year. (ECF No. 23-2, PageID.136-137; ECF No. 23-3, PageID.175). Omar transferred to the University of Michigan in 2014, and she graduated with a political science degree in 2017. (ECF No. 23-2, PageID.136-37; ECF No. 23-3, PageID.175). Throughout high school and college, Omar relied on various accommodations for her disability. (ECF No. 23-2, PageID.135-39).

In 2020, Omar began applying to law schools, including Wayne State's law school. (ECF No. 23-2, PageID.140). Although Wayne State rejected Omar's application, she was accepted at the University of Toledo for the Fall 2021 semester.

---

[2] To the extent that both parties' motions attach identical depositions and other email exhibits, these are cited from the Board's motion only because that is the first filing on the docket.

(ECF No. 23-2, PageID.140, 143-44). However, Omar ultimately only attended one week of classes there and then deferred her enrollment because of an issue with her disability-related scholarship through the State of Michigan. (ECF No. 23-2, PageID.140-41). Instead of returning to the University of Toledo, Omar reapplied to Wayne State for the Fall 2022 semester and was initially waitlisted. (ECF No. 23-2, PageID.143-44; ECF No. 24-9, PageID.731).

Around this time, Kathy Fox, the law school's admissions officer, reached out to Omar to discuss her application, particularly how Omar could benefit from an improved LSAT score. (ECF No. 23-2, PageID.144-45; *see also* ECF No. 23-8, PageID.203-05). Omar never retook the LSAT, and Wayne State ultimately denied Omar's second application; but it accepted her as a part-time student for the Fall 2023 semester when she applied a third time. (ECF No. 23-2, PageID.145-46; ECF No. 23-26; ECF No.24-9, PageID.733; *see also* ECF No. 23-8, PageID.206).

Omar first reached out to SDS regarding potential accommodations at Wayne State's law school in August 2022, while her second application was waitlisted. (ECF No. 23-2, PageID.146-47; ECF No. 23-10, PageID.222). Omar continued to discuss accommodations requests with SDS and various law school faculty once she was accepted for the Fall 2023 semester, but these discussions essentially broke down around the spring of 2023 because Omar felt the University was unreceptive to the totality of her needs. (ECF No. 23-2, PageID.147-50, 53-54, 56-59, 64-65; *see*

*generally* ECF Nos. 23-10, 23-12 - 23-18, 23-21 - 23-25; 24-6).  On April 26, 2023, Cherise Frost, SDS's director, emailed Omar, stating that (1) the University granted various accommodation requests regarding testing and technology, (2) it would allow certain limited modifications to the law school's cold-calling practices, and (3) it denied a request "for a fully remote, distance learning program" because this would be "a fundamental alteration to the WSU Law School's course of study." (ECF No. 23-27, PageID.316-17).  The email identified various proposed alternate accommodations the University believed would reasonably address Omar's identified needs. (ECF No. 23-27, PageID.316).

Omar filed this action on July 14, 2023, making three separate claims all related to SDS and the law school's alleged failure to reasonably accommodate her disability. (ECF No. 1, PageID.7-14).  Both parties now move for summary judgment.

## II.  Legal Standard

Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Once the movant has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the summary-judgment motion." *Bernard v. Wal-Mart, Inc.*, No. 22-3735, 2023 U.S. App. LEXIS 7669, at *3 (6th Cir.

Mar. 30, 2023).  "In resolving a summary judgment motion, this court must view the evidence in the light most favorable to the non-moving party." *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407, 414 (6th Cir. 2024) (quotation marks and citation omitted).  "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. City of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019) (quotation marks and citation omitted).

## III.   Analysis

### A. Governing Law

Given the similarities between the relevant provisions of the ADA and the Rehabilitation Act, the analysis of Omar's claim under both statutes is materially identical. *Babcock v. Mich.*, 812 F.3d 531, 540-41 (6th Cir. 2016); *Qiu v. Univ. of Cincinnati*, 803 Fed. Appx. 831, 836 (6th Cir. 2020).  The same is true for her claim under Michigan's PWDCRA. *Mote v. City of Chelsea*, 252 F. Supp. 3d 642, 648-49 (E.D. Mich. 2017).

In order to establish a prima facie case for failure to accommodate, Omar must show that: (1) she is disabled as defined by law; (2) she is otherwise qualified for the law school program, with or without reasonable accommodation; (3) the University knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the University failed to provide the necessary

accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974, 982-83 (6th Cir. 2011); *Mootoor v. E. Ky. Univ.*, No. 20-6166, 2022 U.S. App. LEXIS 6879, at *15 (6th Cir. Mar. 15, 2022) (unpublished opinion); *see also Finley v. Huss*, 102 F.4th 789, 825 (6th Cir. 2024) ("To succeed on a failure-to-accommodate claim, a plaintiff must show that the defendant reasonably could have accommodated his disability but refused to do so, and that this failure to accommodate impeded his ability to participate in, or benefit from, the subject program.") (cleaned up).

A defendant need not make such accommodations if doing so "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3). And "plaintiffs are not entitled to their preferred accommodations, but merely a reasonable one that provides meaningful access to the public entity." *Huss*, 102 F.4th at 825 (quotation marks and citation omitted). Determining whether a particular accommodation is reasonable is "highly fact-specific, requiring case-by-case inquiry." *Id.* at 825-26 (quotation marks and citation omitted).

"Once an accommodation is requested, the school has a duty to engage in the interactive process: a series of informal meetings and discussions to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Newell v. Cent. Mich. Univ. Bd. of Trs.*, No. 19-11988, 2020 U.S. Dist. LEXIS 142366, at *25-26 (E.D.

Mich. Aug. 10, 2020) (quoting *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84-85 (6th Cir. 2012)).

> A school's failure to participate in the interactive process is actionable if the student demonstrates that 1) the school knew about the student's disability, 2) the student requested accommodations, 3) the school did not show good faith in seeking appropriate accommodations, and 4) appropriate accommodations could have been provided but for the school's lack of good faith.

*Id.* at *26, *citing Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004).

Here, it is undisputed that Omar is disabled, the University knew she was disabled, and she requested accommodations to participate in the law school's program. However, the parties disagree regarding whether: (1) Omar was otherwise qualified for the program; (2) the accommodations at issue were necessary and reasonable; (3) Omar or the University abandoned or otherwise failed to engage in the interactive process to identify Omar's limitations and potential accommodations; and (4) Omar's request for remote learning involved a fundamental alteration to the program.

## B. The Accommodations at Issue

As an initial matter, the parties dispute the precise nature of Omar's remote-learning request that the University denied and is primarily at issue here. Omar argues that she requested only "*partial* remote learning" (ECF No. 24, PageID.423 (emphasis added); *see also* ECF No. 24, PageID.428-29, 440; ECF No. 26, PageID.779, 782-84, 798; ECF No. 27, PageID.819-20), whereas the Board argues

that she sought a fully remote law school experience, (ECF No. 23, PageID.108-110; *see also* ECF No. 25, PageID.749, 762-63; ECF No. 28, PageID.826-28). According to the Board, "[o]nly after [the University]'s objections, during this litigation, did Omar belatedly claim willingness to attend rare guest lectures, upper-level clinics, and upper-level discussion-based classes in person." (ECF No. 25, PageID.762-63).

Documentation from SDS summarizing the parties' accommodation discussions shows that "[Omar's] therapist recommend[ed] she attend[] law school completely remotely," and these records otherwise repeatedly reference Omar's request for "full distance learning" and a "completely remote, distance learning program," among similar phrasing. (ECF No. 23-10, PageID.222, 226, 231). The record, however, includes a letter from Omar's therapist stating that she "require[s] the attendance of law school to be remote part-time." (ECF No. 23-7, PageID.201).

Omar in March 2023 provided the University with a spreadsheet detailing her specific accommodation requests and associated needs. (ECF No. 23-10, PageID.225-28; (ECF No. 23-13, PageID.252; ECF No. 23-15; ECF No. 23-16). The spreadsheet explicitly references "distance education for class," noting Omar's concerns with attending class in person. (ECF No. 23-15, PageID.268).

In later conversations between Omar and SDS staff, they discussed extensively Omar's request for "distance learning," a "distance education," a "full-time" remote accommodation, and to "transition the entire program to be remote."

8

(ECF No. 23-14, PageID.258-60, 262-63, 265; ECF No. 23-18, PageID.282-86; ECF No. 23-21, PageID.301-02).  And Omar's husband said Omar was merely requesting the same program alterations the law school already provided during COVID, when it was fully remote for all students. (ECF No. 23-14, PageID.259-61).  When SDS mentioned the possibility of allowing "some remote components" to the law school program, Omar noted already proposing various alternatives to in-person attendance, like "meeting with professors one-on-one or having recorded lectures or having just the audio of lectures." (ECF No. 23-14, PageID.261).

In a final conversation between Omar and Frost, SDS's director, Frost told Omar the University was "not able to offer a fully remote option." (ECF No. 23-21, PageID.299-300).  The University's later emails to Omar similarly state that it was unable to approve her request for a "full remote, distance learning program." (ECF No. 23-24, PageID.309; ECF No. 23-27, PageID.316; *see also* ECF No. 24-6, PageID.569).  At no point during this process did Omar refute the numerous characterizations that she sought to be fully remote for all law school programming.

Nevertheless, once this process broke down and Omar retained counsel, her attorney clarified in a May 2023 email to the University that Omar "intends to attend all experiential education courses, such as clinics and externships, in person." (ECF No. 24-6, PageID.577, 580).  And Omar testified at her deposition that she sought fully remote attendance for all classes and lectures, but she was willing to attend

clinics, small group discussions, and guest lectures in person. (ECF No. 23-2, PageID.156, 161).  Omar said she never had the chance to explore exactly what she would attend in person, however, because the University was immediately resistant to her initial mention of remote learning. (ECF No. 23-2, PageID.156-57).  Although Omar was unsure what, if any, specific portions of the law school's first-year curriculum she could attend in person, she rejected the University's characterization that she was asking for a fully remote education. (ECF No. 23-2, PageID.156-57, 161).

There is certainly evidence supporting the Board's position here.  But the Court should not weigh the evidence or assess credibility on a motion for summary judgment, and the record also includes evidence allowing reasonable jurors to find in Omar's favor concerning the scope of her request.  First, the therapist letter references "the attendance of law school to be remote part-time," (ECF No. 23-7, PageID.201), and it is unclear whether this refers to Omar being remote part-time, or her being fully remote for the part-time law school program into which she was admitted.  The spreadsheet's reference to *class* being remote also reasonably supports that Omar's request only applied to lectures, not to clinical or other non-lecture-based programming.  These facts, along with Omar's testimony and the later emails from her attorney, allow for the reasonable conclusion that Omar's remote-learning request was limited to large lectures, and she only failed to clarify this

during discussions with the University because of her frustration with and stress from the accommodations process.

Lastly, although the parties' arguments mostly involve Omar's request for remote learning, her other requests (1) to modify cold-calling, (2) for an aid to help with citations, and (3) for a private examination space remain tangentially relevant. (*See* ECF No. 23, PageID.123-24; ECF No. 26, PageID.794; ECF No. 23-2, PageID.149, 158-64).

### C. Omar's Expert Report

To support her motion, Omar provides and expert report from Robert Dinerstien, a law professor at the American University College of Law specializing in disability law. (*See* ECF Nos. 24-7, 24-10).  The Board argues that Dinerstien's report is inadmissible and otherwise irrelevant under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (ECF No. 25, PageID.765-71).  Omar counters that Dinerstien is qualified as an expert in disability law, his report is reliably based on his experience in this field and the record here, his conclusions are relevant and pertinent to the case, and his conclusions appropriately address factual issues. (ECF No. 27, PageID.821-22).

For an expert opinion to be admissible under Rule 702 of the Federal Rules of Evidence, "(1) the witness must be qualified by knowledge, skill, experience, training, or education; (2) the testimony must be relevant, meaning that it will assist

the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony must be reliable, as assessed by its factual basis and the sufficiency of its principles and methods." *Daycab Co. v. Prairie Tech., LLC*, 67 F.4th 837, 853 (6th Cir. 2023) (cleaned up).

However, "[a] district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000); *see also San Francisco v. Wendy's Int'l, Inc.*, 221 W. Va. 734, 743 (W. Va. 2007) ("the few courts addressing the issue have concluded that the *Daubert* gatekeeping regime is of limited utility in the context of a summary judgment motion, and have held that the better practice is to permit the parties a hearing to defend the admissibility of an expert's proffered opinion"); *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("A trial setting normally will provide the best operating environment for the triage which *Daubert* demands. . . . [G]iven the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record.").

Accordingly, the Court defers any conclusion regarding the admissibility of Dinerstien's purported opinions unless and until the issue is more appropriately

raised in a motion in limine or trial motion, and therefore can be addressed with the benefit of a clearer factual record surrounding Dinerstien's potential testimony.

### D. Fundamental Alteration to the Program and Deference to the University

A defendant need not make an accommodation if doing so "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3). Furthermore, according to the Sixth Circuit, "[i]n evaluating whether an accommodation exceeds the bounds of reasonableness and begins to fundamentally alter a school's educational offerings, . . . the federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum and should afford a university's judgment and discretion great respect." *Gati v. W. Ky. Univ.*, 762 F. App'x 246, 250-51 (6th Cir. 2019) (unpublished) (quotation marks and citation omitted); *see also id.* at 251 ("Right or wrong, we must credit the university's academic decision with the widest range of deference.").

Neither *Gati* nor any other authority within this circuit explains the precise extent of deference that should be extended in this case. But this deference cannot be absolute, or else schools could effectively avoid any liability under the ADA and related statutes by declaring any requested accommodation to be a fundamental alteration and/or unreasonable. The Court therefore turns to cases from other circuits for guidance.

13

In *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807 (9th Cir. 1999), the Ninth Circuit stated that "courts still hold the final responsibility for enforcing the [ADA and the Rehabilitation Act], including determining whether an individual is qualified, with or without accommodation, for the program in question." *Id.* at 817; *see also Singh v. George Wash. Univ.*, 368 F. Supp. 2d 58, 69 (D.D.C. 2005) ("Reasonable deference is one thing, blind deference another.").

"We must ensure that educational institutions are not disguising truly discriminatory requirements as academic decisions; to this end, the educational institution has a real obligation to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation." *Wong*, 192 F.3d at 817 (cleaned up). "Subsumed within this standard is the institution's duty to make itself aware of the nature of the student's disability; to explore alternatives for accommodating the student; and to exercise professional judgment in deciding whether the modifications under consideration would give the student the opportunity to complete the program without fundamentally or substantially modifying the school's standards." *Id.* at 818. "We defer to the institution's academic decisions only after we determine that the school has fulfilled this obligation." *Id.* (quotation marks and citation omitted).

In *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 (4th Cir. 2012), the Fourth Circuit similarly stated that in affording "great respect" to a university's

judgments regarding a medical student's qualification and the reasonableness of his proposed accommodations, "we must take care not to allow academic decisions to disguise truly discriminatory requirements." *Id.* at 463 (quotation marks and citation omitted).  To do so, courts should "assiduously review the record to ensure that the educational institution has conscientiously carried out its statutory obligation to provide reasonable accommodations to persons with disabilities." *Id.* (cleaned up).

In *Chin v. Rutgers*, 697 Fed. Appx. 751 (3rd Cir. 2017), the Third Circuit described the approach as follows:

> In assessing a school's judgment as to a student's qualifications for an academic program, courts consider two aspects of the decision: first, did the academic institution seek suitable means of reasonably accommodating the disabled student and submit a factual record of undertaking that obligation conscientiously, and second, did that process lead the university to reach a rationally justifiable conclusion. Courts may decline to respect a school's judgment when the factual record shows that the school did not conscientiously consider all pertinent and appropriate information in making its decision.

*Id.* at 754-55.

Of these cases, only *Wong* declined to defer to the school's academic determinations.  In *Wong*, a medical school dean's denial of the student's requested accommodation was "not entitled to deference because the University failed to present [the court] with a record *undisputedly* showing that [the dean] investigated the proposed accommodation to determine whether the School of Medicine feasibly could implement it (or some alternative modification) without substantially altering

15

the school's standards. *Wong*, 192 F.3d at 818-19 (emphasis added).  The court first reasoned that the dean failed to conscientiously explore possible accommodations because he denied the request "without informing himself of Wong's need for accommodation of his learning disability." *Id.* at 819.  Second, "[a] jury reasonably could find that [the dean] did not formulate this final rationale for denying the accommodation until long after Wong's dismissal from the School of Medicine," and "[s]uch after-the-fact justification obviously does not satisfy the University's obligation to present 'undisputed facts' showing that it conscientiously considered whether possible modification would fundamentally or substantially alter the school's standards when it decided that it could not reasonably accommodate the disabled student. *Id.*

Next, the court noted that the case presented a question of fact regarding whether the student's requested accommodation was reasonable. *Id.* at 820-21.  The court concluded as follows:

> We re-emphasize that at this stage of the litigation, we examine all of the record evidence in the light most favorable to Wong.  We do not hold that allowing Wong to take eight weeks off between each of the third-year clerkships would have been a reasonable accommodation; in fact, we recognize that a jury may well find that, despite the evidence we have just discussed, this modification to the school's curriculum was not reasonable.  Under the summary judgment standard, however, we do not consider whether a jury could find in favor of the defendant: we affirm the entry of summary judgment only if a jury could not find for the plaintiff.  Here, a jury could decide that the modification he requested in the School of Medicine's program was reasonable.  The district court erred in concluding otherwise.

16

*Id.* at 821.

Lastly, secondary authority indicates that "[t]he discretion to decline modifications is perhaps greatest in the health sciences (and similar skills) because requirements are often imposed to avoid injury to patients or others and students should be able to practice their professions substantially in the customary fashion." James Rapp, Education Law § 10C.03 (2019); *see also id.* at n. 50 (collecting cases).

Here, although this case is in various respects factually distinguishable from *Wong*, the Court concludes that the Board fails to produce a record *undisputably* showing that the University *conscientiously* explored alternatives for accommodating Omar's disabilities. First, like in *Wong* and as explained *infra*, the Court concludes that this case presents a triable issue of fact regarding the reasonableness of Omar's requested accommodations, as well as her qualification for the program and the reasonableness of the University's proposed alternatives.

Most importantly, given conflicting evidence in the record, reasonable jurors could conclude that the University did not conscientiously explore alternatives for accommodating Omar's disabilities because the University effectively shut down her primary request without adequate consideration of her specific disabilities and needs. Omar testified that Dean Welch, in the initial meeting to discuss Omar's request, responded to her "most basic" requests "with disregard," "dismissive language," and "resistance," preventing Omar from discussing the request in detail.

(ECF No. 23-2, PageID.149).  And in Omar's subsequent recorded conversations with SDS, she repeatedly expressed concern that the University was unfairly deferring to law school faculty assumptions that failed to account for her specific disabilities and needs. (*See generally* ECF Nos. 23-14, 23-18).

Indeed, when Welch testified regarding the alleged fundamental alteration to the law school program, she said, "I would have to defer to the faculty" and their methods of teaching, which purportedly would not allow a single student to participate remotely. (ECF No. 23-11, PageID.244).  Welch did then clarify, however, that she raised this point only to think through how Omar's requests would practically work, asserting, "I don't know that faculty preferences matter so much as what the faculty determined to be our fundamental course of study." (ECF No. 23-11, PageID.244).

Next, Welch and Frost, the SDS director, both testified that the University never considered whether they could have accommodated Omar's needs with partially remote learning. (ECF No. 23-11, PageID.245-46; ECF No. 23-9, PageID.217).  And Frost testified that SDS never actually evaluated whether Omar's requests were reasonable in light of her disabilities, but instead denied remote learning and a research assistant as "[un]reasonable and [in]appropriate accommodation[s] *for the law school*." (ECF No. 23-9, PageID.214-17, 219 (emphasis added).

18

For her part, Welch testified that (1) she only told Omar that the requests for remote learning and a research assistant were things Welch "had not seen previously," and (2) she only determined remote learning to be a fundamental alteration after reviewing Omar's spreadsheet and discussing the issue with other faculty at the law school. (ECF No. 23-11, PageID.239-41, 245).  And Frost testified that the final decision by SDS to partially deny Omar's requested accommodations was properly made "with due diligence and discussion with the appropriate parties about the accommodations request." (ECF No. 23-9, PageID.215).  According to Frost, she "engaged in the interactive process and discussed with the law school the various concerns," and SDS's decision was made "in collaboration with the law school." (ECF No. 23-9, PageID.216-17).  And although Omar feels like the entire accommodations process was geared toward protecting the law school, the recorded conversations with SDS show that the University at least listened to, even if it did not appropriately consider, Omar's individualized disabilities and needs.  (*See generally* ECF Nos. 23-14, 23-18).  Ultimately, it is for a jury to evaluate the weight and credibility of the parties' conflicting evidence on this issue.

Furthermore, the record raises significant questions with respect to the University's basis for claiming a fundamental alteration that, in the Court's view, should also be resolved by a jury.  According to Welch, remote learning for Omar

would fundamentally alter the law school program[3] because first-year courses require "back-and-forth . . . interaction between the student and the faculty member, the student and one another [sic], and those in-class interactive teaching tools wouldn't be available in the way that our faculty are currently using them with one person in remote attendance." (ECF No. 23-11, PageID.241).   Welch said the University also considered the infeasibility of participating in clinics and other small classes remotely. (ECF No. 23-11, PageID.244).

Welch said that "it was a vastly different experience when all students are online and the professor is online, and the design of the course is such that it takes into account that everyone is online." (ECF No. 23-11, PageID.242).  Welch testified that if only one student is remote, "there are a lot of things happening in the classroom that the student may not see or be aware of." (ECF No. 23-11, PageID.242).  "The fundamental difference to me is that when we are all remote, the professor can see all students.  The professor can see who is raising their hand.  The student can hear what other students are saying and be able to respond and raise their own hand and participate in the Socratic dialogue in that way." (ECF No. 23-11, PageID.243).

---

[3] The Board argues that Omar's remote learning request would fundamentally alter the law school program, but it makes no similar argument regarding her requests to modify cold calling and for a research assistant.

Welch was also uncertain how Omar could practically participate in Socratic dialogue if she was the only remote participant in class, noting that professors' mode of instruction would need to change. (ECF No. 23-11, PageID.242-43).  Relatedly, SDS in the recorded conversations with Omar repeatedly tried to distinguish the law school's allowances during the COVID-19 pandemic as necessary public safety measures. (*See e.g.*, ECF No. 23-14, PageID.261).

Despite these purported distinctions between fully remote classes and a single student attending remotely, the Court concludes that—in our post-COVID world and given the law school's past and continuing experiences with remote learning— whether Omar's request amounted to a fundamental alteration of the law school program is a factual question for a jury.  First, to the extent that Welch cited the infeasibility of attending clinics and smaller classes remotely, there is a question of fact regarding whether Omar wanted to attend clinics and other non-lecture programming in person. *See supra* Section III.B.

More importantly, it is undisputed that Wayne State's law school was fully remote for all students beginning in 2020 during the COVID-19 pandemic, it continued charging full tuition throughout this period, and the law school returned to traditional in-person learning before Omar was accepted for the fall of 2023. (*See* ECF No. 23-9, PageID.215, 218; ECF No. 23-14, PageID.259-61).  And Dean Welch testified that law schools across the country were fully remote during the COVID-

21

19 pandemic with no fundamental impact on Socratic teaching. (ECF No. 23-11, PageID.241-43).

Moreover, Frost testified that law students had been granted temporary remote learning in the past to accommodate things like or broken leg or recovery from surgery. (ECF No. 23-9, PageID.220; *see also* ECF 23-14, PageID.258, 260). The record also shows that the law school continued to allow remote learning for all students during inclement weather, and it raises at least a factual dispute concerning whether the law school still provides students a remote option for select classes like first-year legal research and writing (with students having the option to enroll in either a fully remote or fully in-person version of the same course). (ECF No. 23-14, PageID.260; ECF No. 23-18, PageID.284, 287; ECF No. 23-2, PageID.157; ECF No. 23-21, PageID.300-01; ECF No. 23-32, PageID.390).

Construing this evidence in Omar's favor, reasonable jurors could conclude that the proposed factual distinction with respect to a single student learning remotely is without merit. In particular, the fact that the law school still uses remote learning, *and* that it has previously granted temporary accommodations to allow single students to participate remotely, support the conclusion that Omar could do the same without fundamentally altering her legal education. Practical experience also colors this analysis. In a post-COVID world, technology is readily available to facilitate a hybrid arrangement with only select participants being remote. Certainly,

22

there would be practical drawbacks with such an arrangement.  But whether such drawbacks amount to a fundamental alteration of the law school's Socratic teaching under the facts of this case—particularly when it is undisputed that all students participating remotely during COVID did not affect the fundamental nature of the program—is for a jury to decide.  For these reasons, the Court concludes that Omar has established a question of fact regarding any fundamental alteration to the law school program.

### E.  Omar's Qualifications for the Program; Necessity and Reasonableness of Accommodations

To be "otherwise qualified," Omar bears the burden to show that she "meets the essential eligibility requirements for . . . participation in [the] program[]," "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2); *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x 974, 983 (6th Cir. 2011); *see also Carten v. Kent State Univ.*, 78 Fed. Ap'x. 499, 500 (6th Cir. 2003) ("A handicapped or disabled person is 'otherwise qualified' to participate in a program if he can meet its requirements with necessary accommodations.").

Because this question depends on "whether some reasonable accommodation is available to satisfy the legitimate interests of both the grantee and the handicapped person, . . . the 'otherwise qualified' and 'reasonable accommodation' inquiries

merge." *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 678 F. Supp. 2d 576, 582 (E.D. Mich. 2009) (cleaned up).  Furthermore, "[o]ne element of the 'otherwise qualified-reasonable accommodation' analysis is whether an accommodation is 'necessary.'" *Id.*

"The concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Id.* at 582-83 (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996)). "Stated differently, there must be a 'direct nexus' or 'direct correlation' between the plaintiff's handicap and the barrier to his or her equal access to the program or benefit at issue." *Id.* at 583 (quoting *Schanz v. Village Apts.*, 998 F. Supp. 784 792 (E.D. Mich. 1998)).

Omar argues that she is otherwise qualified and able to meet the law school's essential requirements because she "has repeatedly succeeded academically when given consistent accommodations." (ECF No. 24, PageID.431-33).  Omar emphasizes her bachelor's degree from the University of Michigan, and that she is now successfully completing a master's program at the University of Oklahoma. (ECF No. 24, PageID.432-33).  Omar also relies on her expert's opinion that she is otherwise qualified for the law school program, and she asserts that the University's insistence that she still enroll for classes after it denied her accommodation request

further supports this conclusion. (ECF No. 24, PageID.433-34; *see also* ECF No. 24-10).

In contrast, the Board argues that Omar is not otherwise qualified because (1) she cannot perform essential functions of a legal education—specifically, preparing citations and participating in interactive, Socratic-method-based instruction—even with accommodations; and (2) she rejected the University's proposed alternate accommodations. (ECF No. 23, PageID.118-22).

On the Board's first point, the Court concludes that, based on the parties' conflicting evidence, there is a question of fact regarding whether Omar was generally able to meet the law school's requirements with reasonable accommodations.  Specifically, Omar successfully completed her undergraduate degree despite significant limitations from her blindness, and even after being diagnosed with anxiety and depression in 2021, Omar—as confirmed at the hearing—is on track to earn a graduate degree from the University of Oklahoma. The law school also actively recruited Omar and encouraged her to reapply, demonstrating at least an initial belief that she was qualified for the program.

To the extent the Board argues that Omar could not participate in the essential requirements of Socratic questioning and citing legal authority given her extensive accommodations requests, Omar presents sufficient evidence to the contrary. Specifically, Omar's testimony and discussions with SDS, if construed in her favor,

show that she was not seeking to be exempt from either of these aspects of the law school curriculum.  Instead, Omar sought modifications to these practices that she believed, considering her multiple disabilities, would reasonably level the playing field.

Omar repeatedly said she only wished to modify cold calling for questioning to either be limited to one-on-one questioning with professors, or else to just avoid questions that require real-time references to visual materials.  Presumably, Omar could still fully engage with Socratic questions involving general subject-matter or theoretical issues that do not involve a visual reference.  And Omar said she would be willing to demonstrate proficiency in legal citation, but only wanted assistance with longer writing assignments to alleviate eye fatigue from her blindness, among similar concerns.  It is also notable that the University ultimately informed Omar in late April 2023, when it formally denied her remote-learning request, that (1) "modification to cold-calling practices can be accommodated," at least to allow Omar some advance notice or to opt out on select days; and (2) SDS would be able to assist with "securing specialized writing support" to address her need for a research assistant. (ECF No. 23-27, PageID.316-17).

A reasonable jury could surely conclude that Omar's accommodations requests for remote learning, a research assistant, and to modify cold calling revealed for the first time that she could only meet the law school's requirements with

extensive, unreasonable modifications.  But even this inference is undercut by the fact that law school officials continued to encourage Omar to enroll and attend orientation as late as August 2023, well after her requests and the breakdown of accommodations discussions. (*See* ECF No. 24-6, PageID.612-13).

Concerning the Board's argument that Omar rejected proposed alternate accommodations, it correctly cites *Gati*, 762 F. App'x 246, for the proposition that an individual who "rejects a reasonable accommodation . . . is no longer a qualified individual as a matter of law." *Id.* at 252 (cleaned up).  There is no dispute that when the University denied Omar remote learning, it offered various alternatives it believed would address her stated needs.

Nevertheless, the Court ultimately concludes that this case presents triable issues of facts regarding the reasonableness and necessity of Omar's requests, and the reasonableness of the University's proposed alternatives.  As an initial matter, Omar—construing the evidence in her favor at this stage of the proceedings—met the minimum the showing to establish necessity.  Specifically, Omar's testimony raises a triable question of fact regarding whether her requests would "affirmatively enhance [her] quality of life by ameliorating the effects of [her] disability[ies]," *i.e.*, whether there is "a 'direct nexus' or 'direct correlation' between the [Omar]'s handicap and the barrier to . . . her equal access to the [law school] program." *Fialka-Feldman*, 678 F. Supp. 2d at 582-83.  Omar testified extensively concerning how her

blindness, anxiety, and depression interact and affect her life; how her diagnoses created barriers to her education; how past accommodations (many similar to those requested here) allowed her to overcome these barriers; and how her specific requests to the law school would alleviate barriers from her disabilities and allow her to participate in the program.  And this testimony mirrored Omar's recorded discussions with SDS.

Next, as stated, determining whether a particular accommodation is reasonable is "highly fact-specific, requiring case-by-case inquiry." *Huss*, 102 F.4th at 825-26; *see also Chavez v. Waterford Sch. Dist.*, 720 F. Supp. 2d 845, 857 (6th Cir. 2010) ("As with a plaintiff's status as 'qualified' under the ADA, the question whether an employee has been reasonably accommodated is normally one of fact for the jury.").

Because the reasonableness and fundamental alteration inquiries are related, *see Gati*, 762 F. App'x at 250 (discussing evaluation of "whether an accommodation exceeds the bounds of reasonableness and begins to fundamentally alter a school's educational offerings"), many of the factual issues already discussed also apply to the reasonableness of Omar's request for remote learning.

Furthermore, as referenced repeatedly by Omar in her discussions with SDS, recently revised accreditation policy from the American Bar Association (ABA) waives the distance education credit limit with respect to remote participation in an

in-person course if allowed as an accommodation under the ADA. (ECF No. 23-19, PageID.293). Therefore, ABA policy contemplates remote learning as a potential reasonable accommodation in at least some circumstances. Welch even acknowledged as much at her deposition. (ECF No. 23-11, PageID.246).

Omar also, as discussed regarding necessity, testified extensively concerning how her disabilities interact and affect her life; how her diagnoses created barriers to her education; how past similar accommodations allowed her to overcome these barriers; and how her specific requests to the law school would alleviate barriers and allow her to participate in the program. Again, this testimony mirrored Omar's recorded discussions with SDS. In the Court's view, these facts suffice to create a question of fact on the reasonableness of Omar's requests.

Moving to the University's proposed alternatives, there is also a question of fact regarding whether these were reasonable and adequately responded to Omar's needs. As stated, Welch and Frost both testified that the University never considered whether they could have accommodated Omar's needs with partially remote learning. And to the extent Omar argues that the university's alternatives did not fully address her needs, resolving this would require the Court to weigh conflicting facts and the credibility of Omar's testimony. Accordingly, given the fact-intensive nature of the reasonableness inquiry, it is for a jury to resolve the disputes on this element.

### F.  Parties' Engagement in the Interactive Process

Both parties assert that the other essentially abandoned or otherwise refused to engage in the interactive process, justifying summary judgment in their favor. (ECF No. 23, PageID.124-25; EF No. 24, PageID.437-39).

To reiterate, the University had a duty to engage in "the interactive process: a series of informal meetings and discussions to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Newell*, 2020 U.S. Dist. LEXIS 142366 at *25-26 (quoting *Melange*, 482 F. App'x at 84-85).  But Omar can only sustain a claim for a failure to participate in the interactive process if the University "did not show good faith in seeking appropriate accommodations, and . . . appropriate accommodations could have been provided but for the school's lack of good faith." *Id.* at *26 (citing *Clark*, 109 F. App'x at 755).  "Evidence of good faith arises when the school provides alternative accommodations in response to a student's request or readily meets with the student to discuss the request." *Id.*

The Court concludes that although factual questions exist surrounding whether the University *conscientiously* explored alternatives for accommodating Omar's disabilities, *see supra* Section III.D, Omar cannot establish bad faith.  First, Omar's misplaces reliance on (1) the university never "submit[ing] any

documentation for approval to the ABA regarding Omar's request[]"; and (2) Dean Welch responding to Omar's initial request with resistance and outright denial.[4]

Regarding the ABA, the record shows that the university did reach out about Omar's request and the ABA's requirements with respect to remote learning, but the ABA was unable to "advise [on] the applicability of the law to a specific individual." (ECF No. 23-20, PageID.295-96).  Next, even accepting Omar's description of her conversation with Welch, this was not a part of the University's formal or typical accommodations process.  In fact, Omar testified that she proactively reached out to Dean Welch to "make an introduction," "keep a cohesion between SDS and the law school," and "have everyone on the same page." (ECF No. 23-2, PageID.149).  And the record indisputably reflects that Omar and SDS thereafter met numerous times to discuss the requests before the University made its ultimate decision, with significant back-and-forth regarding Omar's specific disabilities and associated needs.

The Court acknowledges that Welch and Frost both testified that the University never considered whether they could have accommodated Omar's needs with partially remote learning.  And Frost testified that SDS partially denied Omar's accommodations request out of deference to the law school, with little if any

---

[4] At the hearing, Omar's counsel elaborated that the university's entire process was essentially flawed because the law school held an effective veto over Omar's requests.

consideration of Omar's individualized needs.  Nevertheless, given the totality of the record, this does not rise to bad faith.

As discussed, according to Welch, she only determined remote learning to be a fundamental alteration after reviewing Omar's spreadsheet and discussing the issue with other faculty at the law school.  And Welch maintained that she and the University understood Omar's request to be for fully-remote attendance for all law school programming, which posed particular challenges.  Furthermore, Frost testified that the final decision by SDS to partially deny Omar's requested accommodations was properly made after engaging in the interactive process and with due diligence and discussion with appropriate parties, including the law school.

Even construed in Omar's favor, this record at most demonstrates an honest misunderstanding as to the nature of Omar's request, as seemingly acknowledged in her briefing. (*See* ECF No. 24, PageID.438 ("If there had been an interactive process, then WSU would have had less room to *misinterpret*" Omar's request for remote learning) (emphasis added)).  Omar herself even acknowledged that during her discussions with the University, she failed to adequately clarify her willingness to participate in certain programming in person.

Furthermore, although reasonableness of the requested and alternative accommodations at issue is a matter for a jury, the record contains undisputed evidence that the University acted in good faith.  Specifically, (1) the University

readily met with Omar numerous times during an almost three-month period to discuss her needs and requested accommodations, and (2) it offered alternative accommodations in response to Omar's request. *See Newell*, 2020 U.S. Dist. LEXIS 142366 at *26. Accordingly, any claim that the University failed to engage in the interactive process fails as a matter of law.

Moving to Omar's conduct with respect to this process, the Sixth Circuit has held that a defendant is not liable for a failure to provide reasonable accommodations if the plaintiff "voluntarily abandoned the [interactive] process." *Brumley v. UPS*, 909 F.3d 834, 840 (6th Cir. 2018). In *Brumley*, the court concluded that the plaintiff failed to establish a question of fact concerning whether she voluntarily abandoned this process or was coerced into doing so because her own testimony contradicted the existence of any coercion. *Id.* at 840-41.

Here, however, there is no such contradiction. And to the extent Omar argues that she was effectively coerced into ending discussions with the University because "[h]er only choices were to give up law school or start . . . law school set up to fail" (ECF No. 26, PageID.798), this is reasonably supported by the record.

Again, Omar testified that Dean Welch initially dismissed Omar's requests, preventing Omar from discussing them in detail. And in Omar's subsequent recorded conversations with SDS, she repeatedly expressed concern that the University was unfairly deferring to law school faculty assumptions that failed to

account for her specific disabilities and needs.  Most importantly, during Omar's conversations with the University, she was up against a deadline to pay her enrollment deposit. (ECF No. 23-9, PageID.219; ECF No. 24-6, PageID.572, 582-83; ECF No. 23-14, PageID.257).  And Omar only disengaged from the process after almost three months of meetings with the University failed, at least in her mind, to provide any reasonable resolution.  Given the multitude of factual issues already discussed concerning the reasonableness of Omar's accommodations request and the University's response thereto, along with Omar's disclosure to SDS that "knowing what accommodations are [available] is also a huge differentiating factor" before placing her deposit (ECF No. 23-14, PageID.257), Omar established a question of fact regarding whether she voluntarily abandoned the interactive process.

In sum, although the University as a matter of law acted in good faith and thus did not fail to engage in the interactive process, there remain numerous other factual questions precluding summary judgment in the Board's favor.  At the same time, these same factual questions—particularly those regarding whether; (1) the accommodations requested and proposed as alternatives were reasonable, (2) the request for remote learning implicated a fundamental alteration to the law school program, (3) Omar was otherwise qualified for the program, and (4) Omar voluntarily abandoned the interactive process—also preclude summary judgment in Omar's favor.

### G. Immunity; Availability of Monetary Damages

Finally, the Board argues that the University has sovereign immunity with respect to Omar's state-law PWDCRA claim, as well as any claim for monetary damages and retrospective relief. (ECF No. 23, PageID.127-28).  Omar in response distinguishes the Board's authority and counters that she can maintain claims for monetary damages and retrospective relief because, although she brought no Fourteenth Amendment claim, the University's misconduct in this case "sound[s] in procedural due process." (ECF No. 26, PageID.800-03).

As an initial matter, Omar does not contest that Wayne State is immune with respect to her PWDCRA claim.  And the Sixth Circuit has repeatedly endorsed dismissal of PWDCRA and similar state claims on the basis of sovereign immunity. *See Stanley v. W. Mich. Univ.*, 105 F.4th 856, 861, 866-67 (6th Cir. 2024); *Kerchen v. Univ. of Mich.*, 100 F.4th 751, 757, 766 (6th Cir. 2024); *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015); *Freeman v. Mich., Dep't of State*, 808 F.2d 1174, 1176, 1179 (6th Cir. 1987).  The Court therefore dismisses Omar's PWDCRA claim.

Concerning the availability of monetary damages and retrospective relief, the Eleventh Amendment "forbids a plaintiff from suing a state, a state agent, or a state instrumentality for monetary damages in federal court unless that state has consented to suit, or unless Congress has clearly and expressly abrogated the state's immunity

to suit." *Kerchen*, 100 F.4th at 761; *see also Stanley*, 105 F.4th at 863 ("Unless immunity is removed, individuals cannot seek monetary damages or retrospective relief.") (quotation marks and citation omitted).

According to the Fifth Circuit, Title II of the ADA "abrogates state sovereign immunity where it prohibits conduct that violates the Fourteenth Amendment." *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1026 (5th Cir. 2022).

> Under *United States v. Georgia*, 546 U.S. [151, 159 (2006)], we ask three questions to decide whether the defendants are entitled to sovereign immunity: First, has Pickett stated a plausible Title II claim? Second, to the extent that she has, do those allegations also state a violation of the Fourteenth Amendment? Third, to the extent that Pickett has stated a plausible Title II claim that is not also a Fourteenth Amendment violation, has she identified prohibited conduct that is congruent and proportional to a pattern of Fourteenth Amendment violations that Congress sought to remedy?

*Id.*; *see also Saqr v. Univ. of Cincinnati*, No. 18-542, 2019 U.S. Dist. LEXIS 26467, at *9 (S.D. Oh. Feb. 20, 2019), *adopted by* 2019 U.S. Dist. LEXIS 41137 (S.D. Oh. Mar. 14, 2019) (also relying on *Unites States v. Georgia* and applying the same test); *Babcock v. Michigan*, 812 F.3d 531, 534-35 (6th Cir. 2016) (same).

The Sixth Circuit has held "that a Title II claim sounds in due process and abrogates sovereign immunity where the plaintiff alleges that he [or she] was excluded from participating in a proceeding guaranteed . . . by the Due Process Clause on the basis of . . . disability." *Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409, 413 (6th Cir. 2002). In *Robinson*, the court concluded that immunity

applied because the plaintiff's alleged denial of process was unrelated to his disability. *Id.*  It distinguished these facts from another case where immunity was waived because the plaintiff "claimed that the state's refusal to accommodate his hearing disability denied him the opportunity to participate meaningfully in a hearing to determine custody of his children." *Id.* at 411-13.

Here, Omar has a viable Title II failure-to-accommodate claim, and she presented sufficient evidence to submit this claim to a jury.  But Omar does not make any related claim under the Fourteenth Amendment, nor does she allege or argue that she was excluded from participating in any proceeding or otherwise denied notice or any opportunity to be heard because of her disabilities. *See Garcia v. Fannie Mae*, 782 F.3d 736, 741 (6th Cir. 2015) (Procedural due process "at its core requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner.") (quotation marks and citation omitted).

Furthermore, to the extent Omar argues that the University's misconduct in this case sounds in procedural due process because it failed to engage in the interactive process, the Court already concluded that Omar cannot maintain any claim under the ADA or Rehabilitation Act regarding the interactive process here. *See supra* Section III.F.  Having determined that the process-related portion of Omar's claims is without merit, the Court defers to the reasoning in *Saqr*, 2019 U.S. Dist. LEXIS 26467 at *11-24, to conclude that immunity is not waived for typical

Title II ADA failure-to-accommodate claims, at least in the context of graduate programs like that here.  For these reasons, the Court concludes that Omar is not entitled to monetary damages or retrospective relief.

* * *

For the reasons given, the Court ORDERS that the Board's motion for summary judgment (ECF No. 23) is DENIED.

IT IS FURTHER ORDERED that Omar's motion for summary judgment (ECF No. 24) is DENIED.

IT IS FURTHER ORDERED that Omar's state law PWDCRA claim is dismissed without prejudice.

IT IS FURTHER ORDERED that Omar is not entitled to monetary damages or retrospective relief.

Dated: April 4, 2025                              s/Robert J. White
                                                  Robert J. White
                                                  United States District Judge